UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Case No. 05-143 (RJL) |
| | ) | |
| ROBERT FRANK MILLER, | ) | |
| | ) | |
| Defendant. | ) | |

**FILED**

DEC - 3 2018

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(November 30, 2018) [Dkt. ## 155, 180, 184]

On November 20, 2007, after a nine-day trial, defendant Robert Frank Miller

("Miller" or "the defendant") was found guilty by a jury of nine counts of travel fraud

and two counts of wire fraud. Miller appealed and raised a number of challenges to his

conviction and sentence, including claims that his trial counsel was constitutionally

deficient. Our Circuit Court affirmed Miller's conviction and sentence, but it remanded

his ineffective-assistance-of-counsel ("IAC") claims for me to consider in the first

instance. Following the remand, Miller filed a motion clarifying the specifics of his IAC

claims, and, pursuant to an agreement with the Government, Miller supplemented the

claims he had raised on appeal with new ones. After the initial round of briefing, I held

three days of evidentiary hearings on September 12 and 13, and October 23, 2017, after

which I accepted post-hearing briefing—in the form of proposed findings of fact and

conclusions of law—and heard argument on Miller's IAC claims. I then accepted

post-argument briefing that was ultimately completed on February 5, 2018.

1

Having closely reviewed the evidence presented during the hearings and in the parties' extensive briefing, Miller's IAC claims are **DENIED** for the reasons set forth below.

## BACKGROUND

Over a less than ten-month period in late 2003 and early 2004, Miller, through his company American Funding and Investment Corporation ("AFIC"), defrauded dozens of investors and prospective home buyers out of more than $500,000. *See, e.g.*, 11/16/07 Trial Tr. 985–87 [Dkt. # 72]; Judgment 6–8 [Dkt. # 124]. He operated AFIC from July 2003 through his arrest on April 8, 2004, all the while purporting to offer both high-yield real estate investments and home-buying assistance for individuals with subprime credit. *United States v. Miller*, 799 F.3d 1097, 1100 (D.C. Cir. 2015). In its opinion affirming his conviction and sentence, our Circuit Court summarized Miller's fraudulent scheme as follows:

> First, Miller obtained cash investments from individuals who thought AFIC would invest their money in pools of investment real estate. He told those investors that AFIC would use the invested capital to buy and refurbish foreclosure properties and then resell those properties, at a profit, to home buyers with poor credit. Second, Miller obtained cash "down payments" from prospective home buyers with poor credit. He told those home buyers he would help secure mortgages for them and then would use the down payment funds to buy homes they had preselected.

*Id.* The "mortgage side" of the scheme involved "find[ing] buyers for the properties that [Miller] would acquire from the monies that he collected from the investor side." 11/8/07 Trial Tr. 53–54 [Dkt. # 67]. Potential buyers were told they could purchase "regardless

of their credit history and with little or no money down," because Miller would provide loans through his purported mortgage company. *Id.* at 48, 54–56.

Upon securing the investments, however, Miller neither purchased real estate nor secured or funded any mortgages. *Miller*, 799 F.3d at 1100. Instead, he used the money to sustain and promote AFIC's purported business, taking out newspaper advertisements to attract additional investors, paying rent for AFIC's "extravagant" office space on Pennsylvania Avenue in downtown Washington, D.C., as well as for office equipment and payroll, and even making partial distributions to early investors who demanded recompense. *Id.*; 11/16/07 Trial Tr. 923. Miller also used AFIC investor funds to cover his own personal expenses at bars, restaurants, and hotels. *Miller*, 799 F.3d at 1100; 11/16/07 Trial Tr. 994–1002. The majority of AFIC's investors and prospective home buyers lost their entire investments. 11/16/07 Trial Tr. 980–85; Gov't Trial Ex. 27A.

One of AFIC's early investors was Richard Chisholm, an unemployed real-estate agent. 11/8/07 Trial Tr. 44–45, 69–70. Miller described his real estate investment plan to Chisholm in September 2003, explaining that he would match investments of $5,000, use the $10,000 to "rehab" properties he purchased, sell the properties for at least a $25,000 profit, and split the profits with his investors. *Id.* at 44–46. Chisholm agreed to join AFIC as an affiliate, and he worked there from September to November 2003. *Id.* at 42–43, 46–47, 57–58, 77–78. Chisholm also invested $5,000 of his own money, for which Miller promised a "guaranteed" return of $12,500 within 90 days. *Id.* at 71, 73–74. During the three months that Chisholm worked at AFIC, he did not see Miller

purchase any homes. He saw no evidence that Miller even owned a mortgage company. *Id.* at 56, 78–79. Chisholm lost his $5,000 investment. *Id.* at 77–80.

Another investor, Yerusalem Woldeselassie, invested $5,000 with Miller to help finance the purchase and sale of fifteen properties in Baltimore, which he represented were "presently being conveyed to" AFIC. *Id.* at 145, 155–58. Miller told Woldeselassie that within 90 days she would receive a $200,000 profit, or at least a return of her principal. *Id.* at 146–47. In fact, he had not even offered to buy the fifteen Baltimore properties. 11/9/07 Trial Tr. 189–91, 193–95 [Dkt. # 68]. After 90 days, Woldeselassie wrote to Miller demanding repayment of her principal; Miller did not respond, and Woldeselassie lost her investment. 11/8/17 Trial Tr. 160–64.

Jimmy Cheng invested in AFIC after reading a Washington Post advertisement promising a "guaranteed" fifteen percent return on a $5,000 investment, "secured by real estate." 11/13/07 Trial Tr. 408–09 [Dkt. # 69]. Miller invited Cheng to AFIC's Pennsylvania Avenue offices in November 2003 and gave Cheng the "grand tour." *Id.* at 411–12. Miller introduced Cheng to employees he referred to as real-estate agents and loan officers, which reassured Cheng that AFIC was a legitimate business. *Id.* at 412–20. Cheng invested $25,000 in AFIC on Miller's promise that Cheng would receive at least $25,000 in profit within 90 days. *Id.* at 414, 421–24. Cheng never heard from Miller again, and he lost his entire investment. *Id.* at 432–35. The same fate befell AFIC investors Lawrence Haye, Brenda Alston, and Denise McQueen. 11/9/07 Trial Tr. 322–24, 328–31; 11/13/07 Trial Tr. 447–55; 11/14/07 Trial Tr. 479–88, 449–50, 455–56, 489 [Dkt. # 70].

On the mortgage side of AFIC's operation, Miller placed advertisements offering home-buying help for people with poor credit and secured down payments from individuals for whom he offered to purchase homes and obtain mortgages for the balances. 11/16/07 Trial Tr. 885–88, 890–93, 920–23, 926–29. Anthony Wilburn and Charlene Peters gave Miller down payments of $4,500 and $7,200, respectively. *Id* at 890–91, 893–95, 925–26, 932–35. Both Wilburn and Peters lost their deposits, and neither got a home. *Id.* at 896, 937. When an AFIC employee informed Miller that Peters and her family were at risk of becoming homeless and asked that he return her down payment, Miller replied, "I can't save the world. They can go live with relatives." 11/15/07 Trial Tr. 795 [Dkt. # 71].

In late 2003, Cary Greene and Shawn Campbell met with Miller about Miller potentially purchasing their 65 rental properties in Baltimore, which were held by Queen Anne, LLC. 11/9/07 Trial Tr. 211–14. Greene provided Miller with a portfolio of photographs, descriptions, appraised values, and rent rolls for the properties, and offered to sell the properties to Miller for $2.2 million. *Id.* at 216–22. Miller declined to put down a deposit to buy the properties—and Greene and Campbell never heard from him again—but Miller kept the portfolio, which he then used to solicit and obtain investments from Anthony Stephen Roberts ($15,000), Robert Debnam ($143,000), and Haye ($25,000) under the pretense that he already had acquired the properties. *Id.* at 224, 226, 261–64, 268–71, 276–77, 279–80, 332–45; 11/14/07 Trial Tr. 554–56; 564–66; 569. In the weeks following the investments, Miller became "harder and harder to reach." 11/9/07 Trial Tr. 289–91, 349–50; 11/14/07 Trial Tr. 561. Then, in late March 2004,

5

Miller told Roberts, Debnam, and Haye that he would soon be closing on the properties and that on April 9, 2014, they would be paid "in full." 11/9/07 Trial Tr. 287–89, 353–56. Roberts and Haye lost their entire investment; Debnam lost all but $10,000, which Miller paid—using funds obtained from another AFIC investor—after Debnam threatened to contact the local media to do an "expos[e]." *Id.* at 291–93, 359; 11/14/07 Trial Tr. 561–62; 11/19/07 Trial Tr. 1038 [Dkt. # 73].

In February 2004, Miller spoke with Charles Wilson, the president of Foxworthy, Inc., which owned 22 rental properties in Georgia. 11/14/07 Trial Tr. 492–94. On March 12, 2004, Miller contracted to buy the Georgia properties from Wilson for $750,000, and he made a $10,000 deposit. *Id.* at 495–98, 496–99, 515–16. The deal was scheduled to close on May 12, 2004. *Id.* at 495–98, 515–16. On March 26, 2004, Miller enlisted an AFIC employee to send a form letter under the employee's signature to the tenants of the Georgia properties, which stated, among other things, that AFIC had "acquired the property you presently live in" and that the tenants should send rental payments from February through April 2004 to AFIC within 10 days or face "IMMEDIATE EVICTION PROCEEDINGS." *Id.* at 587–93, 545–46, 588–90, 633–34, 642; Gov't Trial Ex. 26L, Attachment C. The letter also offered to help the tenants obtain a mortgage through AFIC to purchase their present home and enclosed a mortgage application. *Id.*

On April 6, 2004, having learned of Miller's letter to the tenants of his properties, Wilson sued Miller and AFIC. 11/14/07 Trial Tr. 500–01. Wilson's complaint noted that Foxworthy had been contacted by the Secret Service. *Id.* at 523, 597–98. On Thursday, April 8, 2004, Miller directed several AFIC employees to place 22 boxes of files and

records in a Ford Explorer that Miller's secretary, Tonya Smith, had borrowed from her mother and parked in the building garage. 11/15/07 Trial Tr. 713–15; Stipulation of Facts ("Stipulation") 1 [Dkt. # 20-1]. Miller told AFIC employees that he was leaving for the weekend to organize the files and that they should not come into work on Friday. 11/15/07 Trial Tr. 713–14.

On April 8, 2004, Secret Service Special Agent Anthony Saler learned from an AFIC investor that Miller was in the process of moving files out of AFIC's offices and that he had told AFIC employees not to come to work the next day (when Miller was due to meet with an AFIC investor). Aff. of Anthony Saler in Supp. of Search Warrants ("Saler Aff.") 7 [Dkt. # 19-1]. Agent Saler was concerned that Miller may be attempting to flee or destroy evidence. *Id.* At approximately 5:30 p.m. that evening, Agent Saler and other law enforcement officers arrested Miller at AFIC's offices on unrelated outstanding Maryland state arrest warrants. *Id.*; Stipulation 1. Agent Saler spoke to Smith, who agreed to drive the Ford Explorer containing the 22 boxes of records to the Secret Service Washington Field Office, where the files were turned over. Saler Aff. 7. On April 27, 2004, Agent Saler obtained a warrant to search the contents of the 22 boxes as well as AFIC's offices. Supp. App. at 433, *Miller*, 799 F.3d 1097 (No. 08-3116).

On April 22, 2005, a grand jury indicted Miller on nine counts of travel fraud, 18 U.S.C. § 2314, and two counts of wire fraud, 18 U.S.C. § 1343. Indictment [Dkt. # 1]. Miller was found guilty as charged by a jury on all counts on November 20, 2007, following a nine-day trial. On December 10, 2008, I sentenced Miller to 204 months' imprisonment and ordered him to pay $495,954.49 in restitution. Judgment 3, 6. From

pretrial through sentencing, assistant federal public defender Jonathan Jeffress served as

Miller's lead counsel. 9/13/17 Hr'g Tr. 183, 229 [Dkt. # 174]. Miller appealed his

conviction and sentence, arguing that I erred in denying Miller's pretrial motion to

suppress the 22 boxes seized from the Ford Explorer, that his trial counsel was ineffective

in his handling of the suppression claim and in failing to move for dismissal of his

indictment for violation of the Speedy Trial Act ("STA"), that I made certain evidentiary

errors, that the Government made certain improper remarks during its closing argument,

and that I erroneously ordered that Miller's federal sentence run consecutive to his

Maryland state sentence for separate crimes. Our Circuit Court rejected Miller's

challenges to his conviction and sentence but remanded his IAC claims for me to

consider in the first instance. *Miller*, 799 F.3d at 1108.

Following our Circuit's remand, I held a status hearing on March 2, 2016, and set

a briefing schedule. On April 18, 2016, Miller filed a motion specifying and—pursuant

to an agreement with the Government and in service of judicial economy—

supplementing his IAC claims, which the Government opposed on May 18, 2006.

[Dkt. ## 155, 157]. Miller then filed a reply brief followed by a supplemental brief on

June 24, 2016. [Dkt. ## 158, 160]. I held three days of evidentiary hearings on

September 12 and 13, and October 23, 2017, during which only Miller and Jeffress

testified. The parties were allowed to file post-hearing proposed findings of fact and

conclusions of law, which they submitted on December 15, 2017. [Dkt. ## 179, 180].

Three days later, on December 18, 2017, I heard argument on Miller's IAC claims, after

which I permitted the parties to submit post-argument briefing to address any remaining issues. Those briefs were filed on February 5, 2018. [Dkt. ## 183, 184].

## STANDARD OF REVIEW

The Government contends that Miller's IAC claims are subject to the heightened standard set forth in 28 U.S.C § 2255, which governs collateral attacks raised by federal prisoners on their sentences. Gov't's Proposed Findings of Fact and Conclusions of Law ("Gov't's Br.") 4 [Dkt. # 179]; *see United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992) (defendant raising "a § 2255 collateral challenge" must "show a good deal more than would be sufficient on a direct appeal from his sentence"). Miller, however, is not collaterally attacking his federal sentence. Our Circuit remanded Miller's IAC claims after his direct appeal for this Court to consider them in the first instance. *See Miller*, 799 F.3d at 1103 (D.C. Circuit's "general practice" is to remand colorable IAC claims "raised for the first time on direct appeal"). Indeed, Miller and the Government agreed that Miller would raise "all of his *potential* collateral attack claims" at this stage precisely to avoid the burden of litigating the IAC issue a second time in the context of a § 2255 motion. 3/2/16 Hr'g Tr. 7 [Dkt. # 164] (emphasis added); *see also* 12/18/17 Hr'g Tr. 7 (Government counsel stating that "[e]ven though this is not technically a 2255, it does address claims of ineffective assistance of counsel" for purposes of efficiency); Def.'s Proposed Findings of Fact and Conclusions of Law ("Def.'s Br.") 1 [Dkt. # 180-1]. That agreement, however, did not convert Miller's remanded IAC claims into a collateral attack under § 2255.

9

Miller's IAC claims are thus governed by the usual standard applicable to IAC claims raised on direct appeal. *See Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Gray-Burriss*, 251 F.Supp.3d 13, 17 (D.D.C. 2017) (applying *Strickland* standard only following remand of IAC claims after direct appeal). I trust that the Government's mistake regarding the applicable legal standard was earnest !

## I.    Ineffective Assistance of Counsel

"To prove constitutionally defective representation, the defendant must show: (1) 'that counsel's performance was deficient,' and (2) 'that the deficient performance prejudiced the defense.'" *United States v. Cassell*, 530 F.3d 1009, 1011 (D.C. Cir. 2008) (quoting *Strickland*, 466 U.S. at 687). The defendant shoulders the burden of proof as to both elements. *See, e.g.*, *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[A] defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel[.]"). As such, the "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim," and courts have discretion to dispose of the claim without "address[ing] both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697, 700; *see also United States v. Gwyn*, 481 F.3d 849, 854 (D.C. Cir. 2007) (because defendant "suffered no prejudice from trial counsel's [alleged deficiency], we need not decide whether counsel's performance in this respect was objectively unreasonable").

*Strickland*'s deficiency prong requires the Court to determine whether counsel acted "reasonabl[y] under prevailing professional norms . . . considering all the

circumstances." *Strickland*, 466 U.S. at 688; *see Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (deficiency is "necessarily linked to the practice and expectations of the legal community"). As a general matter, "the standard for constitutionally effective representation is not overly rigorous." *United States. Catlett*, 97 F.3d 565, 570 (D.C. Cir. 1996); *see also Hinton v. Alabama*, 571 U.S. 263, 272 (2014) (attorney performance need only "meet[ ] . . . a minimal standard of competence"). The Court does not sit as an armchair quarterback, nitpicking counsel's gameday performance from the bench. To the contrary, "[j]udicial scrutiny of counsel's performance must be highly deferential," and courts must be vigilant against the "all too tempting" lure "to second-guess . . . counsel's defense after it has proved unsuccessful." *Strickland*, 466 U.S. at 689 (courts should make "every effort . . . to eliminate the distorting effects of hindsight"). There is a "wide range of reasonable professional assistance," and there are "countless ways to provide effective assistance in any given case." *Id.* These realities of legal representation give rise to a "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* Surmounting this presumption is, in the Supreme Court's words, "never an easy task." *Padilla*, 559 U.S. at 371; *see Strickland*, 466 U.S. at 690 ("[S]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

To establish prejudice under *Strickland*, a defendant must "affirmatively prove" that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693–94. This is not to say that *any* likelihood of an alternative outcome will suffice. A

"reasonable probability" in the *Strickland* context is one that is "sufficient to undermine confidence in the outcome." *Id.* at 694. The prospect of a different result must "be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). While not an exact analogue, the requisite showing approaches a "more-probable-than-not standard." *Id.* "At bottom, defense counsel's error must have been 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *United States v. Brinson-Scott*, 714 F.3d 616, 623 (D.C. Cir. 2013) (quoting *Strickland*, 466 U.S. at 687). As such, our Circuit Court itself has noted that it is "very difficult for a convicted defendant to prevail on a claim of ineffective assistance of counsel." *United States v. Moore*, 703 F.3d 562, 574 (D.C. Cir. 2012).

## ANALYSIS

Miller and the Government, as previously noted, agreed that Miller would raise all of his potential IAC claims at the present stage.[1] I, therefore, will consider only those claims that Miller developed during the IAC evidentiary hearings and subsequently presented in his proposed findings of fact and conclusions of law and post-argument submission. *See generally* Def.'s Br.; Def.'s Post-Argument Br. ("Def.'s Supp. Br.") [Dkt. # 184].

### I.      Claims Related to Counsel's Performance at the Suppression Stage

Miller contends that his counsel was constitutionally deficient in litigating his pretrial motion to suppress the 22 boxes of documents seized from the Ford Explorer

---

[1] As such, any IAC claims that are now ripe but not presently before the Court will be considered waived for purposes of any future § 2255 action. *See* Def.'s Br. 1.

under the Fourth Amendment. While there are many threads to Miller's Fourth Amendment IAC claim, the thrust of his argument is that counsel missed a number of opportunities to present additional evidence at the suppression stage to establish Miller's Fourth Amendment standing—i.e., his individualized privacy (or possessory) interest, *see United States v. Sheffield*, 832 F.3d 296, 303 (D.C. Cir. 2016)—to challenge the search of the Ford Explorer and/or the seizure of the boxes. *See* Def.'s Br. 2–11, 21–24.

Unfortunately for the defendant, there is a flaw common to each variant of his Fourth Amendment IAC claim—and it is a fatal one. IAC claims predicated on an alleged failure to competently litigate a Fourth Amendment suppression motion are subject to the gloss placed on *Strickland* by the Supreme Court in *Kimmelman v. Morrison*, 477 U.S. 365 (1986). To successfully mount such a claim, a defendant must not only satisfy *Strickland*'s deficiency prong but also establish both that "his Fourth Amendment claim is meritorious" and prejudice in the form of "a reasonable probability that the verdict would have been different absent the [allegedly] excludable evidence." *Kimmelman*, 477 U.S. at 375; *see United States v. Wood*, 879 F.2d 927, 934 (D.C. Cir. 1989). Here, Miller, having focused almost exclusively on standing to the exclusion of the remainder of his burden, cannot prevail on his Fourth Amendment IAC claims. More to the point, even assuming that (a) counsel's alleged failures amount to constitutional deficiency,[2] and (b) competent counsel would have presented evidence establishing the

---

[2] They do not. The record strongly supports the conclusion that trial counsel's purported suppression errors regarding standing—principally, not calling Miller or Tonya Smith to testify and not introducing the so-called "Smith Report"—did not fall outside

defendant's Fourth Amendment standing, Miller has not come close to showing either

that his suppression claim would have succeeded or that excluding the 22 boxes would

have produced a different verdict. *See Kimmelman*, 477 U.S. at 375; *Wood*, 879 F.2d at

934.

## A. Merits of the Fourth Amendment Claim

The defendant has not shown—and, as I explain below, likely could not show—

that his Fourth Amendment challenge would have succeeded. He appears to operate

under the mistaken impression that the record is devoid of evidence bearing on the

prospects of suppression and that, therefore, he has met his burden. *See* 12/18/17 Hr'g

Tr. 40 (arguing that the "warrantless search [was] presumptively illegal" and "since no

evidence was taken [on the merits of the suppression claim], then the presumption must

be that the evidence would have established the suppression without more"); Def.'s Br.

24. According to Miller, the merits of his Fourth Amendment challenge were "off the

table" before trial such that the existing record is of no use in assessing whether it would

have prevailed. 12/18/17 Hr'g Tr. 41. I disagree. To the contrary, I find that the record

is sufficiently developed to assess whether Miller's Fourth Amendment challenge was

meritorious. *See Ray v. United States*, 721 F.3d 758, 763–64 (6th Cir. 2013) (record

"contained sufficient evidence to contradict" defendant's Fourth Amendment IAC claims

"without the need for additional evidence" where "the same district court judge

considering [the IAC claims] presided over [the] criminal trial" and thus "observed the

---

the range of reasonable professional assistance. I accept the Government's proposed
conclusions of law on these issues. *See* Gov't's Br. 19–35.

testimony of all witnesses" and "could rely on [his] own recollections of the

proceedings"); *see also United States v. Lawson*, 410 F.3d 735, 740 n.4 (D.C. Cir. 2005)

(Fourth Amendment standing need not be resolved before a court may address whether

probable cause existed on the merits). Indeed, I specifically note that Miller was

permitted three days of evidentiary hearings to supplement the trial record precisely for

the purpose of supporting his IAC claims.

Notwithstanding this extra hearing time, the defendant failed to establish that his

suppression motion would have succeeded, thereby foreclosing his Fourth Amendment

IAC claims. How so? The record indicates that Agent Saler had probable cause to

believe that the Ford Explorer contained evidence of Miller's suspected fraud at the time

of the April 8 search and seizure. Agent Saler—a trained lawyer with extensive

experience investigating financial and other fraud—executed an affidavit supporting an

April 27 warrant to search the boxes after their seizure, in which he swore that he knew,

among other things, that Miller:

- Previously had "been arrested approximately 45 times," that "[a] number of these arrests relate[d] to fraud or theft," and that Miller "ha[d] several fraud related convictions, including 1995 Maryland felony convictions relating to a scheme in which Mr. Miller sold victims' automobiles, kept the sales proceeds and falsely represented to the victims that the automobiles had been stolen or vandalized";

- According to public reporting, engaged "in fraudulent schemes involving credit repair, mortgages, real estate, a medical clinic and used cars" and allegedly made false representations about his occupation;

- Was under indictment in Maryland for "felony theft and fraudulent misappropriation by a fiduciary" involving "a scheme to fraudulently obtain down payments from potential home buyers";

15

- Leased office space for AFIC on Pennsylvania Avenue in D.C. for $20,000 per month but, according to ex-employees of AFIC whom Agent Saler interviewed, was struggling to pay rent and meet payroll, despite taking in hundreds of thousands of dollars in investments. Miller allegedly had attempted to pay rent with a counterfeit check;

- Would, according to former employees, "take up-front fees from customers or investors knowing that he would not be providing the promised services or investments." The former employees also reported that Miller routinely hid from disgruntled investors;

- Had used the portfolio for the Queen Anne LLC properties to fraudulently represent that he owned the properties and secure approximately $300,000 in investments, after which Miller "failed to return calls" and did not return "any of the promised profits or a return of the[] principal." *See supra* at 5–6;

- On or about March 26, 2004, sent letters to the tenants of the Foxworthy properties falsely representing that he had acquired the properties and demanding rent for February, March, and April 2004, as well as threatening eviction if they did not comply within 10 days. After learning of the letters, Foxworthy officials sued Miller and AFIC "in connection with their fraudulent and tort[ious] activity in connection with the letters and other acts," which resulted in a temporary restraining order against Miller and AFIC. *See supra* at 6; and

- Was, on April 8, 2004, in the process of "moving files out of the [AFIC] office and had told all of the employees not to report to work on April 9, 2004," raising the concern that "Miller may be fleeing and/or destroying evidence."

Saler Aff. 2–7; Supp. App. at 436, *Miller*, 799 F.3d 1097 (No. 08-3116).

While Agent Saler's affidavit is undated, raising the question whether he knew the aforementioned facts at the time of the April 8 search and seizure (an issue the Government does not address in its submissions), the record indicates that, had the issue been litigated at the suppression stage, the Government likely would have established that by April 8 Agent Saler knew all—or at least the vast majority of—the facts set out in the affidavit. Indeed, Jeffress represented to the Court during trial that "Agent Saler . . . was

investigating Mr. Miller long before the indictment came down in this case" on April 22,

and that Agent Saler "interacted with a lot of witnesses prior to Mr. Miller even being

arrested" on April 8. 11/7/07 Trial Tr. 8 [Dkt. # 78]. Agent Saler's trial testimony

confirmed Jeffress's statements. Agent Saler testified that he began investigating AFIC

on March 15, 2004, when he first spoke to a potential AFIC investor. 11/16/07 Trial Tr.

967. Agent Saler then spoke to several other AFIC investors and former employees, *id.*,

as confirmed by multiple trial witnesses. *See* 11/8/07 Trial Tr. 96, 138 (Chisholm);

11/14/07 Trial Tr. 471, 474, 523–33, 597–98 (Wilson). On March 26, 2004, Agent Saler

visited AFIC's offices to speak to AFIC's lessor to "see what they knew about what

actually was going on [at AFIC], and what they knew about Mr. Miller and their

experience with him." 11/16/07 Trial Tr. 968.

Apart from his own investigation, Agent Saler was also in contact with Maryland

law enforcement officials investigating Miller for fraud prior to April 8. Agent Saler

"had requested information [about Miller] through a law enforcement database" and

communicated with Special Agent Lori Dicriscio of the United States Department of

Housing and Urban Development's Office of Inspector General. Decl. of Special Agent

Lori Dicriscio ("Dicriscio Decl.") 6 [Dkt. # 93-2]. Agent Dicriscio had been

investigating Miller since 2000 and had "conducted many interviews, reviewed thousands

of records, and executed five search and seizure warrants" to uncover "an elaborate and

varied real estate scam conducted by Miller" in which "Miller portrayed himself as an

investor, mortgage broker and lawyer to induce primarily low income, uneducated

individuals with poor credit to" invest so that Miller could purportedly purchase

17

foreclosed properties. *Id*. at 4. The Maryland Attorney General's Office indicted Miller

in March 2004, a fact that Agent Saler relied on in his affidavit. *See id.* at 6; Saler Aff. 3.

Finally, Agent Saler's trial testimony confirmed that he went to AFIC's offices on

April 8, 2004 because he "had received information that Mr. Miller was packing up boxes

[of files], that they were being moved to a vehicle, and that he had told his employees not

to come to work the next day." 11/16/07 Trial Tr. 968. After arriving at AFIC's offices,

Agent Saler spoke to Smith, who told him that the boxes were in the Ford Explorer

parked in the garage. *Id.* at 969.

Given these facts, had the merits of suppression been litigated the Government

very likely would have shown that the April 8 search of the Ford Explorer and seizure of

the 22 boxes were lawful. "Authorities may conduct a warrantless search of a motor

vehicle if they have probable cause to believe it contains contraband or evidence of a

crime." *Lawson*, 410 F.3d at 740 (citing *California v. Acevedo*, 500 U.S. 565, 569–70

(1991)). Moreover, if officers have probable cause to believe that the object of the search

will be found in a particular container within a vehicle, they may conduct a warrantless

search not only of the vehicle but also of the container itself. *See, e.g.*, *United States v.

$639,558 In U.S. Currency*, 955 F.2d 712, 717–18 (D.C. Cir. 1992). Officers may also,

as occurred here, "seize [the] container[s] and hold [them] until they obtain a search

warrant." *Acevedo*, 500 U.S. at 575. Here, Agent Saler likely had probable cause to

believe that the 22 boxes in the Ford Explorer contained evidence of Miller's suspected

fraud in the form of AFIC files, which Miller was in the process of moving to evade law

enforcement scrutiny. *See Lawson*, 410 F.3d at 740; *see also United States v. Cardoza*,

18

713 F.3d 656, 660–61 (D.C. Cir. 2013) ("probable cause does not require certainty, or proof beyond a reasonable doubt, or proof by a preponderance of the evidence" but only "a fair probability" that contraband or evidence will be found in a particular place based on a "flexible, all-things-considered approach" (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

### B. Probability that Exclusion Would Have Resulted in a Different Verdict

Even if Miller had shown a meritorious Fourth Amendment challenge, his IAC claim still fails. Miller was required to establish prejudice—i.e., a "reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman*, 477 U.S. at 375. On this point, Miller cites only Jeffress's testimony that suppression of the boxes would have "made the government's case harder in proving Mr. Miller's guilt." Def.'s Br. 24 n.13. To put it mildly, that is insufficient for Miller to meet his burden. Nor, it seems, could he have. As Miller himself states, the contents of the 22 boxes used at trial consisted of "checks received from investors and contracts signed with alleged victims," which the Government also used to create a summary chart. Def.'s Br. 3; *see also* Def.'s Mot. Specifying IAC Claims ("Def.'s Initial Br.") 17–18 [Dkt. # 155]. The Government's case against Miller, however, was built on documents seized from AFIC's offices, records for "numerous bank accounts," information provided by AFIC's lessor, and documents (and testimony) "from many of the individual [AFIC] investors." 11/16/07 Trial Tr. 971. In other words, the evidence against Miller was both overwhelming and derived from a broad set of sources beyond—and likely duplicative of—the contents of the 22 boxes seized from the Ford Explorer. Thus, even setting aside

19

the allegedly excludable documents, "the strength of the government's evidence . . .

would remain virtually unchanged." *United States v. Weaver*, 234 F.3d 42, 48 (D.C. Cir.

2000); *see also United States v. Perez*, 603 F.3d 44, 49 (D.C. Cir. 2010) (alleged

deficiencies could not have prejudiced defendant because government's case "was simply

too strong"); *Gwyn*, 481 F.3d at 855 (no probability of different result "[g]iven the

overwhelming evidence against" defendant).[3]

## II. Claims Related to Counsel's Failure to Seek STA Dismissal

Miller contends next that his counsel performed deficiently in failing to move to

dismiss his indictment for violation of the STA. The STA establishes the general rule

that the failure to bring a criminal defendant to trial within 70 days of the indictment or

arraignment "shall" result in dismissal of the indictment on "motion of the defendant."

18 U.S.C. § 3162(a)(2). In such circumstances, the district court must determine

"whether to dismiss the case with or without prejudice" based on certain non-exclusive

statutory factors: "(i) the seriousness of the offense; (ii) the facts and circumstances of

the case which led to the dismissal; and (iii) the impact of a reprosecution on the

administration of this chapter and on the administration of justice." *Id.* "[T]he presence

or absence of prejudice to the defendant" also is "relevant." *See United States v. Taylor*,

_____

[3] This case is a far cry from those in which a defendant has successfully
demonstrated prejudice in the context of a Fourth Amendment IAC claim. *See, e.g.*,
*United States v. Mercedes-De La Cruz*, 787 F.3d 61, 69 (1st Cir. 2015) (prejudice where
challenged evidence was defendant's inculpatory statements and "[t]he government's
case against [defendant] was based almost exclusively on those statements"); *Grumbley
v. Burt*, 591 Fed. Appx. 488, 501 (6th Cir. 2015) (prejudice where suppression of
challenged evidence "would have single-handedly excluded the principal evidence in
support of [the] charges").

487 U.S. 326, 334 (1988). "Congress did not intend any particular type of dismissal to serve as the presumptive remedy for a Speedy Trial Act violation." *Id.* Rather, the choice of remedy is left "to the guided discretion of the district court." *Id.* at 335. If the court decides to dismiss the indictment without prejudice, the Government has six months to re-indict the defendant. 18 U.S.C. § 3288.

The parties agree that the STA was violated during Miller's prosecution. Gov't's Br. 9; Def.'s Br. 11.[4] As such, I must assess whether Jeffress's failure to move for STA dismissal amounts to constitutional deficiency under *Strickland*. For the following reasons, I conclude that it does not.

Jeffress testified that he discussed with Miller his speedy trial right "many times," and they agreed that Miller did not want to push the issue because a slower pace *favored* his defense. 9/13/17 Hr'g Tr. 201–06.[5] Indeed, the defense requested multiple continuances, deadline extensions, and scheduling accommodations. *See infra* at 25–26. This certainly was not an unreasonable strategic judgment. *See United States v. Bryant*, 523 F.3d 349, 363 (D.C. Cir. 2008) (Randolph, J., concurring) ("As criminal defense attorneys know, delaying a trial often works to the defendant's advantage."). Nevertheless, according to Miller, I should view the considered question of whether to

---

[4] The parties dispute the precise number of non-excludable days. I agree with the Government's computation, as set forth in its brief on appeal, that there were 171 non-excludable days. *See* Brief of Appellee at 61–63, *Miller*, 799 F.3d 1097 (No. 08-3116).

[5] Miller contradicted Jeffress's testimony on this point. For the reasons stated in the Government's brief, I credit Jeffress's testimony and find that he did discuss with Miller his speedy trial rights (albeit, not the possibility of seeking STA dismissal). *See* Gov't's Br. 11–16. I also echo the assessment of Miller's current counsel that during his testimony Jeffress was "as credible a guy as there is." 12/18/17 Hr'g Tr. 27–28.

push for a speedy trial as analytically distinct from the unconsidered question of whether to pursue dismissal. *See* Def.'s Br. 25. As to the latter, Miller contends that counsel was deficient in not "adequately research[ing], investigat[ing], [or] consult[ing] with Miller" about moving for STA dismissal. *Id.*

Miller's dichotomy does not hold water, however, as the two questions, in this case, were inextricably intertwined. Jeffress testified that he "felt along the way that it would be unfair to not be asking for a speedy trial but then go into court and say, hey, you haven't been making findings all along . . . and you need to dismiss this case, even though . . . we haven't been asking for a speedy trial." 9/13/17 Hr'g Tr. 201–06. Jeffress's sense that pursuing an STA violation would be in tension with—and potentially jeopardize—his and Miller's unhurried defense strategy "might well have [been a] sound strategic reason[] for not pursuing the violation." *United States v. Richardson*, 167 F.3d 621, 626 (D.C. Cir. 1999); *see United States v. Rushin*, 642 F.3d 1299, 1307 (10th Cir. 2011) ("[N]ot every decision on the part of defense counsel to forego filing a motion to dismiss upon an apparent violation of the STA is suspect under *Strickland*'s first prong."). Indeed, to the extent Jeffress perceived that taking inconsistent positions to obtain a statutory dismissal would have yielded, at best, a Pyrrhic victory, his impression was well founded. *See Rushin*, 642 F.3d at 1307 (by moving for STA dismissal, defendant may "have lost the favor of a district court that had granted him multiple continuances to date"). In *DiBruno v. United States*, for example, the court noted that trial counsel "reasonably would have understood the Court's frustration at an attorney agreeing to a date in the future, silently lying in wait for a STA violation, and then filing

22

a motion to dismiss on the STA violation." No. 3:11CV297, 2014 WL 4636581, at *13 (W.D. N.C. Sept. 16, 2014). As such, Miller has not established constitutional deficiency.

In addition, Miller was not prejudiced by counsel's failure to move for STA dismissal. Having "carefully consider[ed the statutory] factors as applied to th[is] particular case," *Taylor*, 487 U.S. at 336; 18 U.S.C. § 3162(a)(2), I conclude that if Miller had moved to dismiss his indictment, I would have dismissed it at most without prejudice and allowed the Government to re-indict him on the same charges. *See* 12/18/17 Hr'g Tr. 14, 24. How so?

***First***, the crimes with which Miller was charged (and for which he was convicted) are very serious offenses, as evidenced by Miller's 204-month sentence. *See United States v. Robinson*, 389 F.3d 582, 588 (6th Cir. 2004) ("Given the length of the sentence, the offenses charged against Robinson were serious and favored dismissal without prejudice."). Travel and wire fraud carry significant statutory penalties, including up to ten and twenty years' imprisonment, respectively. 18 U.S.C. §§ 2314, 1343; *see United States v. Koerber*, 813 F.3d 1262, 1276 & n.19 (10th Cir. 2016) (seriousness of offense may be assessed "by considering the length of sentence Congress has adopted"); *United States v. Peeples*, 811 F.2d 849, 850 (5th Cir. 1987) (defendant conceded wire fraud was serious offense where indictment alleged defendant attempted to defraud investor of $500,000 and statute provided for up to five years' imprisonment per count).

Miller's conduct in committing the charged offenses was also very serious. What Miller now calls "amateurish" and "ham-handed . . . sales tactics," Def.'s Supp. Br. 14, I

viewed then, and now, as a brazen fraud perpetrated against vulnerable individuals. I am

also not persuaded that the non-violent nature of Miller's conduct renders the offenses

any less serious. *See id.* at 26–27. Indeed, as one of Miller's own cases makes clear,

"[w]hite collar crime and wire fraud are serious crimes that often have significant effects

on real victims." *United States v. Riffo*, No. 2:10-cr-686, 2013 WL 3967748, at *4 (D.

Utah July 31, 2013); *see Peeples*, 811 F.2d at 850.[6] Other judges on this Court have

reached similar conclusions. *See, e.g.*, *United States v. Briscoe*, 839 F.Supp. 31, 36

(D.D.C. 1993) (offenses deemed serious where they involved "a series of false

statements" and kickbacks to the defendant).

Nor do I give credence to Miller's contention that although he fraudulently

obtained hundreds of thousands of dollars, the sum did not surpass $1 million and the

fraudulent scheme was "never likely to grow into something very large." Def.'s Initial

Br. 18; Def.'s Br. 26–27; Def.'s Supp. Br. 14. This says less about the nature of Miller's

crimes and more about the work of the law enforcement officers who investigated and

apprehended Miller *before* he could defraud anyone else. Finally, the Court discounts

heavily Miller's assertion that his crimes were not serious because personally he took

only $55,000 and spent the rest of the money on AFIC's expenses and employee salaries.

Def.'s Supp. Br. 13; *see id.* (arguing Miller was not "living large" by purchasing "homes,

yachts, etc., after bilking thousands of victims"). Miller used the unlawfully obtained

---

[6] Miller also cites *United States v. Caparella*, 716 F.2d 976 (2d Cir. 1983), but that
case involved a postal service employee opening a piece of mail without authority,
plainly a less serious offense than Miller's.

money to support AFIC's purported business, spending funds on newspaper advertisements, impressive office space and equipment, employee salaries, and placating investors who demanded repayment. *See Miller*, 799 F.3d at 1100; 11/16/07 Trial Tr. 923. In other words, while Miller put only a portion of the illicit money directly into his own pocket, he used the remainder to sustain his fraudulent scheme.

*Second*, I find that the facts and circumstances that would have given rise to an STA dismissal weigh heavily in favor of dismissal without prejudice. This factor requires me to "focus on the culpability of the conduct that led to the delay." *Koerber*, 813 F.3d at 1277 (internal quotation marks omitted). Dismissal with prejudice is appropriate where the delay is attributable to "intentional dilatory conduct" or a "pattern" of prosecutorial neglect. *Id.*; *see also United States v. Bert*, 814 F.3d 70, 80 (2d Cir. 2016) ("The Supreme Court has likewise instructed that courts should only preclude reprosecution of a serious crime upon a showing of 'something more than an isolated unwitting violation,' such as a finding of 'bad faith' or a 'pattern of neglect.'" (quoting *Taylor*, 487 U.S. at 339)).

No such intentional dilatory conduct, bad faith, or pattern of prosecutorial neglect occurred in this case. As Jeffress testified, he and Miller believed that delay was in the defense's interest, and they made a strategic decision not to take action to accelerate the trial. In fact, as I noted during the IAC argument, much of the delay between Miller's indictment and trial resulted from defense requests for continuances, extensions of various deadlines, and scheduling accommodations due to defense counsels' conflicts and Miller's concerns. 12/18/17 Hr'g Tr. 31; *see* Def.'s Unopposed Mot. for Continuance of

25

Mots. Deadline [Dkt. # 13]; Def.'s Mot. for Continuance [Dkt. # 33]; 8/24/05 Hr'g Tr. 3–

6 [Dkt. # 129]; 12/19/05 Hr'g Tr. 4 [Dkt. # 130]; 10/25/07 Hr'g Tr. 32–33, 43–45 [Dkt.

# 132]. These facts would strongly favor dismissal without prejudice. *See Briscoe*, 839

F.Supp. at 36 (dismissal without prejudice where "much of the delay in this case was

initiated by, and is attributable to, defendants' own efforts" and "certainly was not due to

any abuse by the Government"). Additionally, the adjudication of Miller's suppression

motion between January 13, 2006 and December 12, 2006, also consumed a significant

amount of time. *See* Def.'s Mot. to Suppress Evidence [Dkt. # 16]; 12/12/06 Hr'g Tr. 6–

7 [Dkt. # 34].

The Government, for its part, was not in any way derelict in prosecuting this case.

For example, the Government pushed for a decision on Miller's suppression motion,

substituted one of its counsel to ensure trial went forward, and opposed defense requests

to continue trial on several occasions. *See* Gov't's Unopposed Mot. for Status

Conference [Dkt. # 29]; Gov't's Resp. to Def.'s Mot. for Continuance [Dkt. # 35];

Gov't's Resp. to Def.'s Requests for Continuance and Appointment of New Counsel

[Dkt. # 46]; *see also United States v. Ferguson*, 565 F.Supp.2d 32, 46 (D.D.C. 2008)

(dismissal without prejudice where "the Government repeatedly represented that it was

ready to proceed to trial"). I reject Miller's accusation of prosecutorial misconduct,

namely that the Government attempted to "hide" or "paper over" the STA violation by

requesting the Court retroactively declare certain time excludable under the STA during a

December 12, 2006 hearing. *See* Def.'s Br. 12–13, 27; 12/18/17 Hr'g Tr. 26–27, 30

(accusing the Government of attempting to commit "an illegal act" by trying "to enlist

[the Court] in papering over the Speedy Trial Act violation"). As I noted at the hearing to which Miller refers, the time period at issue was in fact excludable under the STA because qualifying motions were pending, 12/12/06 Hr'g Tr. 12–13; *see* 18 U.S.C. § 3161(h)(1)(D), and thus did not require an ends-of-justice continuance, *see* 18 U.S.C. § 3161(h)(7). Put simply, I find no bad faith on the part of the Government in this case that would support a prejudicial dismissal. *See United States v. Sparks*, 885 F.Supp.2d 92, 103 (D.D.C. 2012) (delay was "not the result of gamesmanship or malice on the part of the government for the purpose of obtaining a technical advantage"); *United States v. Bauer*, 286 F.Supp.2d 31, 34 (D.D.C. 2003) (delay "was not willful or malicious and the government ha[d] not sought and certainly ha[d] not gained any tactical advantage by the delay").

*Third*, I find that re-prosecution in this case would have served the administration of the STA and of justice. While Miller is correct that dismissal with prejudice would have sent a stronger message to the Government and done more to encourage compliance, Def.'s Initial Br. 19–20; Def.'s Br. 29,[7] I already have concluded that Miller's transgressions were serious and that the delay in this case was not attributable to prosecutorial malfeasance. *See United States v. Wright*, 6 F.3d 811, 816 (D.C. Cir. 1993) ("Whether a dismissal without prejudice will have an adverse impact on the

---

[7] I would be remiss not to point out, however, that "dismissal without prejudice is not 'a toothless sanction'" and has been found to "adequately convey the seriousness of the Government's Speedy Trial Act violation." *United States v. Ferguson*, 565 F.Supp.2d 32, 48–49 (D.D.C. 2008) (quoting *Taylor*, 487 U.S. at 342).

administration of the Act or on the administration of justice depends, in large part, on the seriousness of the defendant's alleged crime and on the reasons for the delay.").

Moreover, the absence of prejudice to Miller resulting from the delay "strongly weighs in favor of dismissal without prejudice." *Ferguson*, 565 F.Supp.2d at 48; *see Taylor*, 487 U.S. at 341. Prejudice in this context manifests in two forms: (1) trial prejudice, i.e., prejudice to the defendant's ability to put on a competent defense, and (2) non-trial prejudice, i.e., prejudice to the defendant's liberty, employment, financial resources, etc. *Bert*, 814 F.3d at 82; *see Taylor*, 487 U.S. at 340–41. As Miller points out, he was subject to Maryland incarceration during the pendency of his federal prosecution, Def.'s Initial Br. 19–20, and thus his non-trial interests were not meaningfully impacted by the delay in this case. Miller's trial defense likewise was unharmed. As I have noted, it was Miller who, quite reasonably, sought multiple continuances in this case in service of his defense strategy and to allow his counsel to better prepare for trial. *See Briscoe*, 839 F.Supp. at 36 ("[A]lthough any significant period of delay inevitably could be labeled 'prejudicial' to a defendant, much of the delay in this case was initiated by, and is attributable to, defendants' own efforts."). Miller identifies no "particularized prejudice to his defense, such as loss of evidence due to the delay." *Robinson*, 389 F.3d at 589. Under the circumstances, while I recognize that the delay in this case was not insubstantial, *see Bert*, 814 F.3d at 81–82, I find that permitting re-prosecution would have served the administration of the STA and of justice.

Having found that I would have dismissed Miller's indictment without prejudice, I conclude that Miller has not demonstrated *Strickland* prejudice. In its opinion, our

Circuit Court posed the as-yet-undecided question whether "a dismissal without prejudice would itself demonstrate *Strickland* prejudice." *Miller*, 799 F.3d at 1105. On these facts, I conclude that the answer is: no ! To establish prejudice under *Strickland*, a defendant must "affirmatively prove" that there was a "reasonable probability" of a different outcome of the proceeding had counsel performed competently. *Strickland*, 466 U.S. at 693–94; *see Rushin*, 642 F.3d at 1309–10. Here, Miller likely *benefited* from his counsel's failure to move for STA dismissal. Had counsel so moved, Miller would have not only been re-indicted on the same charges, but also prodded the Government and the Court to move quickly to trial and invited the inference that Miller's counsel was engaged in "unwarranted gamesmanship." *Rushin*, 642 F.3d at 1308. Miller thus was unharmed by counsel's failure to obtain a non-prejudicial dismissal, a conclusion that comports with those reached by other courts. *See id.* at 1310 n.12 ("At least four of our sister circuits have held that where an indictment would have been dismissed without prejudice, a defendant could not show prejudice based upon trial counsel's failure to seek dismissal under the STA." (collecting cases)).[8] In short, letting that sleeping dog lie was indeed a wise tactic for the defense.

_____

[8] Miller's attempts to articulate prejudice from a non-prejudicial dismissal fail. First, it is not at all clear that Miller's claim that re-indictment might have resulted in a new suppression hearing with a potentially different outcome, *see* Def.'s Br. 31–32, could constitute prejudice in this context, as a "proceeding" for *Strickland* purposes is not limited to "those court processes related to a particular indictment," *Rushin*, 642 F.3d at 1309–10. In any event, the claim fails for the same reason that Miller's Fourth Amendment IAC claims fail: There is no evidence that a second suppression motion would have succeeded. Second, Miller's suggestion of prejudice from the attendant failure to preserve the STA violation for appellate review, *see* Def.'s Br. 12–13, fails because meritorious STA claims are mechanical in nature and "will always be plain to a

## II.    Claims Related to Sentencing

Miller alleges two deficiencies in his counsel's performance at sentencing: (1) failing to request that Miller be placed in a Residential Drug Abuse Program ("RDAP"), and (2) not bringing to the Court's attention that Miller's time in federal custody during the federal prosecution purportedly prevented him from obtaining Maryland state jail credit for that period. Def.'s Br. 33.[9] As to both, I find that Miller has not shown *Strickland* prejudice and therefore decline to consider whether counsel's performance was constitutionally deficient. *See Gwyn*, 481 F.3d at 854.

### A.    Failure to Request an RDAP Recommendation

If counsel had requested that Miller receive RDAP treatment while incarcerated,[10] it is conceivable that I *might* have recommended such treatment, that the Bureau of Prisons ("BOP") *might* have exercised its absolute discretion to allow Miller entry into RDAP, and that, consequently, Miller's sentence *might* have been carried out in a different way. However, a reasonable probability of a different outcome this chain of possibilities does not make. *See Strickland*, 466 U.S. at 693–94. As I noted at the IAC hearing, the most that I could have done in response to an RDAP request was provide "a recommendation. It's up to the [BOP] whether to allow him into the [RDAP] or not."

---

reviewing court and will always affect substantial rights." *United States v. Taplet*, 776 F.3d 875, 880–81 (D.C. Cir. 2015).

[9] Miller notes other complaints about his sentencing, but he does not attempt to explain how the purported errors prejudiced him. *See* Def.'s Br. 34–35. I therefore decline to address them.

[10] Miller does not contend that he asked Jeffress to make such a request and was rebuffed. *See United States v. Smith*, No. 12-20066-32, 2016 WL 2958454, at *3 (D. Kan. May 23, 2016).

12/18/17 Hr'g Tr. 43; *see Tapia v. United States*, 564 U.S. 319, 334 (2011) (courts "may urge the BOP to place an offender in a prison treatment program" pursuant to 18 U.S.C. § 3582(a), which allows courts to "make a recommendation concerning the type of prison facility appropriate for the defendant"). The RDAP program was established "pursuant to a statute that grants discretion to the BOP to provide alternative conditions of confinement for prisoners who have completed the program." *Richardson v. Joslin*, 501 F.3d 415, 417 (5th Cir. 2007) (citing 18 U.S.C. § 3621(e)(2)(A)). While federal courts can make recommendations, they lack any binding effect—the BOP's control over "the place of the prisoner's imprisonment" and "the treatment programs (if any) in which he may participate" is "plenary." *Tapia*, 564 U.S. at 331 (citing 18 U.S.C. §§ 3621(b), (e), (f); § 3624(f)). As such, a "judicial recommendation on matters such as participation in BOP programs is technically not a part of the sentence imposed." *United States v. Smith*, No. 12-20066-32, 2016 WL 2958454, at *3 (D. Kan. May 23, 2016). For these reasons, courts have found consistently that counsel's failure to request RDAP treatment does *not* prejudice a defendant under *Strickland*.[11]

During the IAC hearing, Miller tried to articulate prejudice by arguing that through RDAP he could have gotten "up to one year off of his sentence" and that the "Court would have considered giving [him] an RDAP recommendation so that he gets

---

[11] *See, e.g.*, *Claudio-Zayas v. United States*, No. 14-1402, 2017 WL 3309683, at *9 (D.P.R. Aug. 2, 2017); *Smith*, No. 12-20066-32, 2016 WL 2958454, at *3; *United States v. Saul*, 09-cr-0781-2, 2014 WL 3508640, at *1 (E.D. Pa. July 16, 2014); *Jones v. United States*, Nos. 7:08–CR–105–01, 7:10–CV–22, 2010 WL 4484532, at *5 (E.D.N.C. Oct. 25, 2010).

out at 75 instead of 76 [years of age]." 12/18/17 Hr'g Tr. 73–74. The latter point appears

to run headlong into the Supreme Court's admonition that 18 U.S.C. § 3582(a) does not

permit sentencing courts to "calculate[] the length of [a defendant's] sentence to ensure

that [he or she] receive certain rehabilitative services." *Tapia*, 564 U.S. at 334–35. As

for the former, Miller simply highlights yet another layer of extrajudicial discretion that

prevents him from showing prejudice. Upon successful completion of RDAP, the BOP

"has the authority, but not the duty, both to alter the prisoner's conditions of confinement

and to reduce his term of imprisonment." *Lopez v. Davis*, 531 U.S. 230, 241 (2001); *see*

18 U.S.C. § 3621(e)(2)(B) (stating that "[t]he period a prisoner convicted of a nonviolent

offense remains in custody after successfully completing a treatment program *may* be

reduced by the [BOP]" (emphasis added)); *Beckley v. Miner*, 125 Fed. Appx. 385, 388

(3d Cir. 2005) (even if RDAP is "completed to perfection," BOP has "complete

discretion to require [the defendant] to serve his full sentence"). Miller therefore has

failed to show prejudice resulting from his counsel's failure to request RDAP treatment at

sentencing.

### B. Failure to Inform Court of Maryland State Jail Credit Issue

Miller's second alleged sentencing error also did not prejudice him. As I

explained at the IAC hearing, even if Miller's counsel had notified me during sentencing

of this Maryland jail credit issue, "[i]t wouldn't have made a difference to the sentence I

gave him," which was "crafted . . . [to be] a fair sentence for [Miller's] conduct in [the

federal] case." 12/18/17 Hr'g Tr. 45. Whether Maryland affords Miller credit for his

time in federal custody is "up to Maryland." *Id.* at 46. As such, any perceived unfairness

in Maryland's sentencing credit laws would not have resulted in a different sentence for Miller, even if it had been brought to my attention at sentencing.[12]

## III. Other Purported Deficiencies

Finally, Miller lodges an assortment of additional complaints about his counsel's conduct before and during trial. *See* Def.'s Br. 14–17. However, Miller appears to abandon these claims in his proposed findings of fact and conclusions of law, wherein he suggests that I decline to resolve them. *See id.* at 32–33. Even if Miller had continued to pursue these claims, he does not develop them in any meaningful way, nor does he articulate *Strickland* prejudice. And even if Miller had articulated cognizable *Strickland* claims as to these purported errors, I reject them on the merits for the reasons stated in the Government's briefing. *See* Gov't's Br. 38–44.

## CONCLUSION

For the foregoing reasons, Miller's claims that his trial counsel was constitutionally deficient are **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued herewith.

_____
RICHARD J. LEON
United States District Judge

_____

[12] I am not alone in this conclusion. *See Vasquez v. United States*, No. 2:08–cv–04081, 2008 WL 4279813, *5 (W.D. Mo. Sept. 15, 2008) (counsel not ineffective for failing to request downward departure "based on [defendant's] time in county jail" because court considered relevant statutory sentencing factors and likely would not have lowered defendant's sentence based on county jail time).